IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SCOTT F. POLLARD            :      CIVIL ACTION
                                     :
        v.                    :
                                     :
GEORGE S. COYNE CHEMICAL CO.   :   NO. 07-3744

MEMORANDUM

Dalzell, J.                                May 19, 2008

        Scott F. Pollard here brings claims under Title VII of the Civil Rights Act of 1964 for the allegedly harassing and retaliatory behavior of his co-workers at the George S. Coyne Chemical Company ("Coyne").  Coyne now moves for summary judgment, claiming that Pollard has failed to produce evidence sufficient to carry his burden as plaintiff.  Because we find that, based on the record before us, no reasonable finder of fact could rule for Pollard, we will grant Coyne's motion and enter judgment in its favor.

I.   **Facts**[1]

        Scott Pollard is an African-American warehouseman at Coyne.  He has worked at Coyne since April of 2000.  Pollard Dep.

---

[1] As we are addressing Coyne's motion for summary judgment, we construe any disputed facts in the light most favorable to Pollard.  Bartnicki v. Vopper, 200 F.3d 109, 114 (3d Cir. 1999).

at 12:10.[2]  On at least one occasion, Pollard complained to the union shop steward, Gene Kominski, about racially derogatory comments from one of his co-workers, Mike Riley.  See Kominski Dep. at 15-16.[3]  Kominski has heard Riley use racially derogatory terms like "nigger" and "spic," but never specifically in reference to Pollard.  Id. at 28:24-29:9.  William Batzig, another worker in the warehouse, testified that he has heard Riley call Pollard a "nigger" on several occasions.  Batzig Dep. at 18:23-19:4.[4]  Batzig also testified that Riley is a "racist" and treats African-American co-workers differently than white co-workers.  Id. at 36:9-15.

On May 10, 2005, Pollard was eating lunch in the employee breakroom when Riley came in "raving" that no one had helped him the previous day and that a white man could not get justice.  Pollard Dep. at 76:18-77:5.  Riley then pointed to his hand, indicating his skin color.  Def. Ex. 6.  Pollard told Riley that he found such statements offensive, and Riley responded that Pollard could go ahead and report him.  Pollard Dep. 77:23-78:8.

---

[2] Pollard's deposition is plaintiff's exhibit A.

[3] Kominski's deposition is plaintiff's exhibit H.

[4] Batzig's deposition is plaintiff's exhibit D.

2

Pollard took Riley up on this and filed a written Inappropriate Conduct Report with Coyne's management.  <u>See</u> Def. Ex. 6.  On the report, Pollard mentioned an earlier incident in which Riley had called another co-worker, Mark Williams, a "nigger", and demanded that Coyne terminate Riley's employment.  <u>Id.</u>

Coyne, which does not have a human resources department, hired Steven Moyer to investigate the issue and to speak with Pollard and Riley.  Pollard Dep. at 99:5-17; Moyer Aff. ¶ 2.[5]  Between May 17 and 19, 2005, Moyer interviewed Pollard, Riley, and Joe Cannon, who had witnessed the incident. Moyer Aff. ¶¶ 3-5.  On May 23, 2005, Moyer filed a report with Donald Helwig, Coyne's Vice-President and CFO, in which he recommended that Coyne hire a third party to attempt to mediate between Pollard and Riley, both of whom had indicated a willingness to work things out.  <u>Id.</u> ¶ 6.  Helwig asked Moyer to mediate between Pollard and Riley on the company's behalf.  <u>Id.</u> On June 2, Moyer again met with Pollard.  At that meeting, Pollard refused to meet with Riley or attempt to reconcile with him.  <u>Id.</u> ¶ 7; Pl. Ex. K.  Coyne did not discipline either

---

[5] Moyer's affidavit is defendant's exhibit 7.

Pollard or Riley as a result of the incident.  Helwig Dep. at 59:21-60:1.[6]

In the aftermath of Pollard's formal complaint, Riley became angry.  Kominski Dep. at 27:9-20.  Shortly after Pollard's complaint, Pollard complained to Kominski that Riley was giving him "dirty looks."  Id. at 25:2-14.  Pollard told Kominski that this was in retaliation for his complaint.  Kominski did not report Pollard's concern to anyone at Coyne.  Id. at 26:5-7.

On an unspecified date,[7] when Pollard was on light duty due to a hand injury, he fell asleep in the breakroom because of the painkillers he took for his hand.  While he was asleep, some coworkers put a sign around his neck that said "will work for food."  Pollard was told that Riley was among the employees who had done this.  Riley also took a picture of Pollard with the sign and shared it with some of their coworkers.  Pollard Dep. at 127-130.  Pollard did not report this event or complain to

---

[6] Helwig's deposition is plaintiff's exhibit B.

[7] Pollard does not describe exactly when this happened. Because Pollard claims that this is evidence of retaliation, we will assume for purposes of this motion that it took place between May 10, 2005 and February 20, 2007 when Pollard filed his charge with the EEOC.

management because he "didn't think anything of it."  Id. at
130:23.

Again on an unspecified date, one of Pollard's co-
workers stenciled the letters DOC -- meaning Department of
Corrections -- onto Pollard's work uniform.  Id. at 115:6-7.
Bill Batzig told Pollard that Mike Riley had done this.  Id. at
196:23-197:6.  Again, Pollard did not report this incident.

On September 26, 2006, Riley physically threatened
Pollard and threatened to "take you out side [sic] the gate and
kick your ass."  Pl. Ex. N.  On October 2, Pollard filed a
written complaint about the incident.  Helwig discussed the
matter with the union's business agent, Sean Dougherty, and with
Kominski.  Dougherty told Helwig that he would like to address
the issue with his members and he spoke to both men about the
incident.  Helwig Dep. at 63:16-64:20.  Dougherty reported to
Helwig that the difficulty had been resolved and that Pollard
would be withdrawing his complaint.  Id.

Pollard also alleges ongoing annoying conduct from
Riley and other co-workers.  As Pollard describes it:

> As far as little things that were done to me,
> as far as trying to antagonize me and things
> like I signed the overtime sheet and Mike
> would go ahead and sign Bill's name?  Yeah,
> there are things that happened like that.

> But the bottom line is if I took the date and
> time that every time that happened, I
> couldn't get things done.  It happened all
> the time.  This was a continuous [sic] day
> after day after day after day.

Id. at 134:8-16.  Among the activities Pollard alleges[8] is that

Riley and Batzig would sign each other's names on the overtime

list to deprive Pollard of the overtime.

When Coyne had overtime work available, a sign-up sheet

would be posted to allow employees interested in working the

overtime to sign their names.  The most senior employee to sign

the sheet would get the overtime.  On several occasions, Pollard

did not get overtime that he had signed up for because either

Riley or Batzig had also signed the list.  Both men are senior to

Pollard.  On January 19, 2007, Pollard submitted two complaints[9]

regarding overtime on January 17 and 18 that Batzig had signed up

---

[8] Because Pollard's allegations about this additional
conduct are never made clear, we glean what we can about the
complained of activities from his deposition and from his
memorandum in opposition to Coyne's motion.  Obviously, even at
this procedural posture, we cannot credit unspecified and
conclusory allegations of harassment and so we include only those
incidents for which there are some reasonably specific
allegations.

[9] It is unclear from the record whether these
complaints were submitted to the union or directly to Coyne.  As
there is no Rule 56 evidence that these overtime matters were
racially motivated or retaliatory, they do not bear on the
analysis that follows.

for.  Pollard complained that Batzig had improperly deprived him
of overtime by signing up for overtime slots and then not working
them.  On January 17, Batzig had signed up for an overtime slot
and had then left early to go to his pool league.  Def. Ex. 11.
On January 18, Batzig had signed up for the overtime slot and had
not come in to work it.  Def. Ex. 12.  Pollard also complained,
without including any specific dates or times, that Batzig and
Riley sometimes signed each other's names to the overtime list
for the express purpose of depriving Pollard of overtime.

On February 20, 2007, Pollard filed a charge of
discrimination with the EEOC.  He charged that from "early 2005"
until October 2, 2006 he had suffered racial harassment and
retaliatory discrimination.  Def. Ex. 13.

## II.  <u>Analysis</u>

### A.  Harassment Claims

Pollard's first claim is that he has been subjected to
a racially hostile work environment in violation of Title VII,
Section 1981, and the PHRA.[10]  Title VII makes it "an unlawful

---

[10] Although Pollard asserts claims under the
Pennsylvania Human Relations Act and 42 U.S.C. § 1981 in addition
to his Title VII claims, the legal standard under each of these
statutes is the same.  <u>See</u> <u>Weston v. Commonwealth of</u>
(continued...)

employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  The courts have held that a hostile work environment may form the basis of a Title VII claim where the harassment is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" <u>Meritor Sav. Bank v. Vinson</u>, 477 U.S. 57, 67 (1986) (quoting <u>Henson v. Dundee</u>, 682 F.2d 897, 904 (11th Cir. 1982)).  The jurisprudence is clear, however, that this aspect of Title VII "forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment." <u>Oncale v. Sundowner Offshore Svcs.</u>, 523 U.S. 75, 81 (1998).  In order to be actionable, the environment must be "severe enough to affect the psychological stability of a minority employee." <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1482 (3d Cir. 1990) (quoting

---

[10](...continued)
<u>Pennsylvania</u>, 251 F.3d 420, 425 n.3 (3d Cir. 2001) ("The proper analysis under Title VII and the Pennsylvania Human Relations Act is identical, as Pennsylvania courts have construed the protections of the two acts interchangeably."); <u>Sherrod v. Philadelphia Gas Works</u>, 57 Fed. Appx. 68, 75 (3d Cir. 2003) ("The analysis is the same whether under Title VII, Section 1981 or the PHRA.").  We will, therefore, treat the claims together.

Vance v. S. Bell Tel. & Tel. Co., 863 F.2d 1503, 1510 (11th Cir. 1989)).

"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). In determining whether a workplace is objectively hostile or abusive, we look at "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23.

Because Pollard claims only that he was subjected to discrimination at the hands of his coworkers, not by his supervisors or the company itself, he must also show that "the defendant knew or should have known of the harassment and failed to take prompt remedial action." Andrews, 895 F.2d at 1486 (quoting Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311, 1316 (11th Cir. 1989)).

With all of those issues in mind, we proceed to examine Pollard's specific claims of harassment.

9

In his interrogatory responses, Pollard identifies three occasions on which he complained to Coyne about harassment. See Def. Ex. 5, at 3.  At his deposition, Pollard testified that this list was complete.  Pollard Dep. at 72:22-73:4.  Because there is no evidence in that record that other incidents were reported to Coyne management,[11] if Pollard's harassment claim is to survive it must do so on the basis of those three incidents.

### 1.  May 10, 2005

The first of these complaints dealt with the May 10, 2005 incident in the break room.  Pollard filed a written report that Riley had engaged in inappropriate conduct related to race. As Pollard described the incident:

---

[11] Pollard did testify in vague terms to some other incidents.  On the record before us, however, no reasonable jury could find that Coyne had actual or constructive knowledge of those incidents.  Pollard's brief also makes reference to an occasion on which Riley referred to Pollard as a "nigger."  Pl. Mem. at 10.  Pollard's deposition, interrogatory answers, and written complaints make no reference to such an occasion.  His complaint from May 10, 2005 makes clear that the term was used in reference to Mark Williams, not to Pollard.  See Caver v. City of Trenton, 420 F.3d 243, 263 (3d Cir. 2005) ("[C]omments referring to other individuals that were merely overheard by [plaintiff] are the sorts of offhanded comments and isolated incidents that the Supreme Court ... cautioned should not be considered severe or pervasive enough to constitute a hostile work environment.") (internal quotations omitted).

> I was in the breakroom and Mike [Riley] came
> in raving about nobody helped him yesterday
> and I was the only one to help him and he
> said it was a matter of his skin color as he
> pointed to his hand.

Def. Ex. 6, at 1.  Pollard later testified that Riley also said "white men can't get justice."  Pollard Dep. at 77:1-2.  In that complaint, Pollard also mentioned an incident he had heard about (but apparently not witnessed) in which Riley called another employee, Mark Williams, a "nigger."  Def. Ex. 6, at 1.  Pollard believes that an investigation of the Mark Williams incident was conducted, <u>see</u> Pollard Dep. at 82:22-83:10, and that Riley received a written warning as a result, Def. Ex. 6, at 1.

As a preliminary matter, we note that no reasonable jury could find that this interchange represents "severe" harassment.  The jurisprudence is clear that "'offhanded comments, and isolated incidents (unless extremely serious)' are not sufficient to sustain a hostile work environment claim."  <u>Caver</u>, 420 F.3d at 262 (quoting <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998)).  Although Riley's comment -- at least as Pollard interprets it -- relates to a racial difference between himself and Pollard and might possibly be offensive, it comes nowhere near the level of severity that would be required to support a harassment claim based on an isolated incident.  By

11

comparison, in <u>Caver</u> our Court of Appeals found that a statement that it was "okay to be in the KKK" was insufficient to support liability, even when it was combined with other incidents.  <u>Id.</u> at 263.

In response to Pollard's complaint, Coyne brought in an outside consultant, Steve Moyer, to investigate and counsel the employees involved.  The two men agreed to continue to do their jobs and to stay away from each other.[12]  In the end, the investigation was inconclusive and Moyer recommended that the incident be closed.  Moyer Aff. ¶ 9.

Coyne's obligation under Title VII is not to eliminate all harassment from the workplace, but to promptly and reasonably address harassment that it knows of.  Where an employer takes prompt and adequate remedial action after a report of harassment, it is shielded from liability regardless of whether the remedial action was in fact effective.  <u>Knabe v. Boury Corp.</u>, 114 F.3d 407, 411 n.8 (3d Cir. 1997).  Here, Coyne brought in an outside

---

[12] Although the record does not reveal what shifts the men were working on May 10, 2005, Riley and Pollard usually worked different shifts.  <u>See</u> Def. Ex. 3 (placing Mike Riley on the 5:00 a.m. - 2:30 p.m. shift and Scott Pollard on the 2:00 p.m. - 10:30 p.m. shift from October 3, 2005 to April 3, 2006); Pollard Dep. at 186:23-187:10 (testifying that he and Riley worked different shifts between October 2005 and October 2007).

consultant to investigate[13] and that consultant conducted a
thorough investigation of the reported conduct.[14]  The only
reason further mediation did not take place was that Pollard
refused to participate.  Moyer Aff. ¶ 7.  A employee cannot
refuse to cooperate in the resolution of his report and then
complain that the resolution was inadequate.  Although Pollard
had stated that he would only be satisfied if Riley was
dismissed, see Def. Ex. 6, at 2, it is not up to the complaining
employee to determine how the employer should respond or if that
response is adequate.

        If the employer's resolution is effective, it is per se
adequate.  Bouton v. BMW of N. Am., Inc., 29 F.3d 103, 107 (3d
Cir. 1994).  Here, there were no complaints for more than sixteen
months after Coyne's resolution of Pollard's complaint.  Although
Pollard now claims that there was ongoing harassment during this
period, he produces no evidence that Coyne was aware of ongoing

---

        [13] Helwig and Richard Kondziela expressed concern that
they might be too close to the incidents, particularly because
contract negotiations were ongoing during this time.  See Moyer
Aff. ex. 2.

        [14] Because Pollard complained about only one specific
incident and because the other incident he mentioned -- that
involving Mark Williams -- had already been addressed, there was
no reason for Coyne's investigation to go beyond the May 10
incident itself.

problems.  An adequate resolution need not remedy the problem
immediately.  An employer can act adequately by making a
reasonable effort to resolve the situation with the intention to
take further action if complaints persist.  Here, the management
at Coyne had every reason to believe that its resolution of the
May 10, 2005 incident had been effective and so it was not
obliged to take further disciplinary action.

Finally, although the parties do not argue this point,
it appears that Pollard's claim relating to the May 10, 2005
incident is time-barred.  In Pennsylvania -- which has a state
agency with authority to seek relief -- an EEOC charge must be
filed "within three hundred days after the alleged unlawful
employment practice occurred."  42 U.S.C. § 2000e-5(e)(1).
Pollard signed his EEOC charge on February 20, 2007, or 651 days
after the May 10 incident.

This does not end the matter, however.  A victim may
file based on continuing harassment if he can show that (a) "at
least one act [of discrimination] occurred within the filing
period," and (b) the harassment represents "a persistent,
on-going pattern" rather than "the occurrence of isolated,
intermittent acts."  West v. Philadelphia Elec. Co., 45 F.3d 744,
754-55 (3d Cir. 1995).  In determining whether discrimination

represents a "persistent, on-going pattern," we should consider,
among other factors, "(i) subject matter -- whether the
violations constitute the same type of discrimination; (ii)
frequency; and (iii) permanence -- whether the nature of the
violations should trigger the employee's awareness of the need to
assert [his] rights and whether the consequences of the act would
continue even in the absence of a continuing intent to
discriminate." Id. at 755 n.9 (quoting Martin v. Nannie &
Newborns, Inc., 3 F.3d 1410, 1415 (10th Cir. 1993)).

Here, the only specific allegation prior to September,
2006 is the May 10, 2005 incident.  Although there are vague
allegations[15] about ongoing harassment during the intervening

_____

[15] Pollard's clearest statement about the harassment
during the intervening period is that:

As far as little things that were done to me, as
far as trying to antagonize me and things like I
signed the overtime sheet and Mike would go ahead
and sign Bill's name?  Yeah, there are things that
happened like that.  But the bottom line is if I
took the date and time that every time that
happened, I couldn't get things done.  It happened
all the time.  This was a continuous [sic] day
after day after day after day.

Pollard Dep. 134:8-16.  This conclusory, vague report is far from
sufficient to allow us  -- or any reasonable jury -- to weigh the
West factors and find that there was a continuous pattern of
harassment that would warrant tolling the three-hundred-day
limitations period.

sixteen months, there is nothing that would support a finding of a persistent, ongoing pattern of harassment.

We therefore hold that the May 10, 2005 incident was not sufficiently severe or pervasive to constitute harassment, that Coyne's response to it was timely and adequate, and that Pollard's claims relating to that incident are time-barred.

### 2. Events Between May, 2005 and September, 2006

As we have discussed above, Pollard makes vague allegations about ongoing harassment during this period.  In order for these incidents to form the basis of a harassment claim, Pollard must show that (1) he suffered intentional discrimination because of his race, (2) the discrimination was severe or pervasive,[16] (3) the discrimination detrimentally affected him, (4) it would have detrimentally affected a reasonable person, and (5) there is a basis for respondeat superior liability.  Andrews, 895 F.2d at 1482.  Because we address this on summary judgment, the issue is whether, on the basis of the record before us, a reasonable jury could conclude

---

[16] Andrews actually uses the phrase "pervasive and regular."  In Jensen v. Potter, 435 F.3d 444, 449 n.3 (3d Cir. 2006), our Court of Appeals acknowledged that the proper standard is "severe or pervasive."

16

that Pollard had carried that burden.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

For the events during this time, Pollard has offered no evidence -- other than his own suspicion -- that they occurred because of his race.[17]  Pollard's claim that Riley's attacks were racially motivated does not create a reasonable inference of racial animus and is insufficient to create a triable issue of fact.  See <u>Billet v. CIGNA Corp.</u>, 940 F.2d 812, 816 (3rd Cir.1991) ("Merely reciting that [race] was the reason for the decision does not make it so.").  Further, because he offers no specifics about what occurred during this period or when it occurred, a jury would have no basis on this record for finding that the harassment was severe or pervasive.  Finally, there is no evidence that would support a basis for <u>respondeat</u> <u>superior</u> liability based on the allegations during this period.[18]  For

---

[17] Indeed, Pollard himself testified that Riley had told him that they were harassing him not because of his race but because Pollard had tried to get Riley fired.  <u>See</u> Pollard Dep. at 135:12-13.

[18] Pollard does claim in his brief that he complained to Gene Kominski.  <u>See</u> Pl. Mem. at 11.  Kominski is the union shop steward at Coyne.  Kominski Dep. at 7:22-8:21.  He is not an agent of company management.  In fact, he holds the same position at Coyne as Pollard does: warehouseman.  <u>Id.</u> at 7:19-21.  Thus, a report to Kominski does not put the company on notice of any potential harassment.  Since the union is not a party to this
(continued...)

these reasons, we find that Pollard cannot make out a <u>prima</u> <u>facie</u> case of liability for harassment based on these activities.

### 3.  September 28, 2006

On September 28, 2006, Riley told Pollard that he would "kick your ass".  Def. Ex. 9.  Pollard filed a grievance on October 2.  The grievance makes no mention of a racial motivation for this threat and, in fact, says "he wanted about me [<u>sic</u>] because I tried to get him fired with my prior complaint."  <u>Id.</u> Pollard's brief makes no attempt to cast this incident as racial harassment.  Neither can we find that it is sufficiently severe or pervasive to qualify, even if it were racially motivated.[19] We will, however, revisit this incident in the context of Pollard's retaliation claim.

_____

[18](...continued)
action, we need not concern ourselves with whether the union had some duty to pursue this claim on Pollard's behalf once he reported it to Kominski.

[19] We recognize that the "severe or pervasive" test does not apply to individual incidents but to an entire course of alleged harassment.  Because at this point more than sixteen months had passed since the last reported incident that might have qualified as harassment, we have no choice but to treat it in isolation for this purpose.

### 4.   The "Will Work for Food" Incident

As with earlier incidents, Pollard advances no evidence that the "Will Work for Food" incident was motivated by racial animus.   Indeed, plaintiff testified that he thought the incident was just "horsing around" until he realized that Riley "still held hostility for [Pollard's May 10, 2005 complaint.]" Pollard Dep. at 131:7-17.   Also, as with earlier incidents, because Pollard did not complain, he has failed to advance any basis for respondat superior liability.

In conclusion, because Pollard has failed to establish a prima facie case of race discrimination or racial harassment on the basis of any of these incidents -- whether taken individually or collectively -- we will grant Coyne's motion for summary judgment as to counts one, three, and four.

### B.   Retaliation Claim

Pollard also claims that Coyne -- through Riley -- retaliated against him for his complaint against Riley in March of 2005.   The relevant portion of Title VII[20] is 42 U.S.C. § 2000e-3(a), which states: "It shall be an unlawful employment

---

[20] Again, although Pollard makes retaliation claims under both Title VII and the PHRA, the prohibitions are equivalent and the analysis is the same.   Slagle v. County of Clarion, 435 F.3d 262, 265 n.5 (3d Cir. 2006).

practice for an employer to discriminate against any of his
employees ... because he has opposed any practice made an
unlawful employment practice by this subchapter...."

In order to establish a prima facie case of
retaliation, a plaintiff must show: "1) that [he] engaged in
protected activity, 2) that the employer took adverse action
against [him], and 3) that a causal link exists between the
protected activity and the employer's adverse action." Kachmar
v. SunGard Data Sys., Inc, 109 F.3d 173, 177 (3d Cir. 1997).
Because Pollard seeks recovery not based on Coyne's adverse
action but based on the company's failure to stop retaliation
from his coworkers, see Pl. Mem. at 14 ("Mr. Pollard ... was
subjected to retaliation by Riley ... but Defendant failed to
remedy the situation and the retaliation continued."), he must
also show that "supervisors 'knew or should have known about the
[co-worker] harassment, but failed to take prompt and adequate
remedial action' to stop the abuse." Moore v. City of
Philadelphia, 461 F.3d 331, 349 (3d Cir. 2006) (quoting Jensen,
435 F.3d at 453).

The first element of Pollard's prima facie case is that
he engaged in some activity protected by Title VII.  Pollard
claims that his filing of the May 10, 2005 complaint against

20

Riley is protected activity.  Pl. Mem. at 14.  In order for activity opposing discrimination to be protected under Title VII, "the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII."  Moore, 461 F.3d at 341.  The Supreme Court has made clear that this belief must be objectively reasonable under the actual jurisprudence of Title VII, and not be based on the employee's subjective belief of what Title VII prohibits or should prohibit.  See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 271 (2001) (per curiam).[21]

In Breeden, as here, the employee had complained about a single incident of harassment.  The Supreme Court found that the activity was not protected because the comment at issue was "at worst an 'isolated inciden[t]' that cannot remotely be considered 'extremely serious', as our cases require."  Id. (quoting Faragher, 524 U.S. at 788).

---

[21] In Breeden, the Supreme Court did not, in fact, adopt the "objectively reasonable" standard.  Rather, because that was the standard the Ninth Circuit had applied, the Court found that "even assuming [the rule] is correct, no one could reasonably believe that the incident recounted above violated Title VII."  532 U.S. at 270.  Nevertheless, our Court of Appeals expressly adopted the "objectively reasonable" standard in Moore and so we apply it here with the Supreme Court's guidance.

21

Other courts have held that isolated statements far more racially charged, and far more offensive than those at issue here, could not lead the hearer to an objectively reasonable belief that a Title VII violation had occurred.  In <u>Jordan v. Alternative Res. Corp.</u>, 458 F.3d 332 (4th Cir. 2006), plaintiff's co-worker was watching television immediately after the capture of John Allen Muhammad and Lee Boyd Malvo, who killed ten people and wounded three others in sniper shootings in the greater Washington, D.C. area in 2002.  Plaintiff's co-worker exclaimed, "They should put those two black monkeys in a cage with a bunch of black apes and let the apes f-k them." <u>Id.</u> at 336.  The district court granted defendant's motion to dismiss and the Fourth Circuit affirmed, finding that "[a]lthough Jordan could reasonably have concluded that only a racist would resort to such crudity even in times when emotions run high, the mere fact that one's <u>coworker</u> has revealed himself to be racist is not enough to support an objectively reasonable conclusion that the <u>workplace</u> has likewise become racist." <u>Id.</u> at 341.

Riley's March 10 comment simply pales against the comment in <u>Jordan</u>.  No employee could reasonably believe that Riley's comment was sufficiently severe to support a harassment claim under Title VII.  Pollard has cited no case finding

22

harassment liability on the basis of any incident remotely comparable to the one that took place in the Coyne break room on May 10, 2005.  We therefore find that Pollard's complaint about Riley's comments is not protected activity for purposes of a discriminatory retaliation suit under Title VII.

Even were we to find that Pollard's complaint were protected activity, we find no basis for a finding of employer liability on these facts.  The only evidence that Pollard complained about the allegedly retaliatory conduct to <u>anyone</u> at Coyne between March 10, 2005 and October 2, 2006 is Gene Kominski's testimony that Pollard spoke to him about "dirty looks" that Riley was giving Pollard shortly after the March 10 complaint.  Kominski Dep. at 25:2-17.  <u>Cf.</u> Helwig Dep. at 61:7-12.  As we discussed above, Kominski is not Coyne's agent for this purpose, and talking to Kominski, the union's shop steward, does not put Coyne on notice of allegedly discriminatory conduct. Kominski acknowledged as much when he testified that the reason he did not tell anyone at Coyne about Pollard's report was that "[w]e try to handle things amongst ourselves.  Some of the older guys try to take care of the younger guys and teach them the ways."  Kominski Dep. at 26:17-20.

There is no dispute that on October 2, 2006 Pollard complained about threats of violence from Riley.  In Pollard's EEOC charge, however, he clearly identifies that as the last incident of retaliation.  See Def. Ex. 13 ("The most recent incident occurred in or about October of 2006 when Mike Riley threatened to physically harm me.").  Thus, in filing his charge of discrimination, Pollard testified under penalty of perjury that no retaliatory action was taken against him between October, 2006 and February 20, 2007 when the charge was filed.

Because there was no additional alleged retaliation during that period of nearly five months, we must conclude that Coyne's resolution of the issue -- allowing Dougherty to talk to the two men and convince them to work together without incident -- was effective.  Again, as we discussed above, if the resolution is effective, it is per se adequate.

Although Pollard makes vague references in his deposition to other harassing activity, there is no evidence in the record that he ever told anyone on Coyne's management team about those incidents.  Coyne cannot be held liable for failing to stop harassment about which it was reasonably unaware. Because Pollard has failed to carry his burden of demonstrating that there is a basis for Coyne's liability for the retaliatory

harassment he alleges, we would grant Coyne's motion even if we found that the May 10, 2005 complaint was protected activity.

### C.  Status of the Union

Coyne also seeks summary judgment on the grounds that the union is an indispensable party to this litigation.  Because we grant Coyne's motion based on the merits of Pollard's claim, we need not reach this complex question.


BY THE COURT:


/s/ Stewart Dalzell, J.

25

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SCOTT F. POLLARD            :      CIVIL ACTION
                            :
        v.                  :
                            :
GEORGE S. COYNE CHEMICAL CO.  :    NO. 07-3744

ORDER

        AND NOW, this 19th day of May, 2008, upon consideration

of Coyne's motion for summary judgment (docket entry # 14),

Pollard's response (docket entry # 16), and Coyne's reply (docket

entry # 17), and for the reasons set forth in the accompanying

Memorandum, it is hereby ORDERED that:

        1.      Coyne's motion is GRANTED; and

        2.      The Clerk of Court shall CLOSE this matter

statistically.

                            BY THE COURT:


                            /s/ Stewart Dalzell, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SCOTT F. POLLARD                    :        CIVIL ACTION
                                    :
           v.                       :
                                    :
GEORGE S. COYNE CHEMICAL CO.        :        NO. 07-3744

<u>JUDGMENT</u>

        AND NOW, this 19th day of May, 2008, the Court having

this day granted defendant's motion for summary judgment,

JUDGMENT IS ENTERED in favor of defendant George S. Coyne

Chemical Co. and against plaintiff Scott F. Pollard.


                              BY THE COURT:


                              /s/ Stewart Dalzell, J.